Richard J. MAGRUDER, Plaintiff,

v.

SELLING AREAS MARKETING, INC., a corporation, Defendant.

No. 75 C 4425.

United States District Court,
N. D. Illinois, E. D.

Oct. 21, 1977.

William Levinson, Stiefel, Levinson & Komie, Chicago, Ill., for plaintiff.

John A. McDonald, Keck, Cushman, Mahin & Cate, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

ROBSON, Senior District Judge.

This cause is before the court for decision on liability. For the reasons hereinafter stated, judgment shall be entered for the defendant.

Plaintiff, Richard J. Magruder, a citizen of Illinois, has brought this three count complaint against defendant, Selling Areas Marketing, Inc. [hereinafter SAMI], a foreign corporation with its principal place of business in New York City, New York. The amount in controversy exceeds the sum or value of $10,000, exclusive of interest and costs. The jurisdiction of this court is invoked pursuant to 29 U.S.C. § 626 and 28 U.S.C. § 1332 and is undisputed.

Count I has been brought under the Federal Age Discrimination in Employment Act of 1967 [ADEA], 29 U.S.C. § 621 *et seq.* Plaintiff alleges that his demotion and salary reduction and his subsequent discharge were a result of discrimination based upon age. He further alleges that his discharge was also in retaliation for his opposition to the alleged discrimination because of his age.

Count II has been brought under the provisions of Ill.Rev.Stat. ch. 38, § 65–21 *et seq.* Plaintiff alleges that the actions of the defendants set forth in Count I were taken by the defendant against him because of his physical disability, which physical disability did not interfere with the performance of his duties.

In Count III, plaintiff alleges that the defendant, through its Vice President, Carlysle Daniel, pursued a course of conduct with the intent to inflict mental and physical suffering and anguish upon the plaintiff. This was allegedly done to force plaintiff to accept a demotion and to place defendant in a position which would allow it to discharge the plaintiff and claim that such discharge was for cause.

In the way of relief, plaintiff seeks reinstatement, $500,000 compensatory damages, and $500,000 punitive damages.

Defendant has denied these allegations. It admits plaintiff was demoted, his salary was reduced, and he was subsequently discharged. It asserts, however, that such actions were taken for sound business reasons and were taken because plaintiff did not perform his duties and tasks in a competent and workmanlike manner.

After submitting a final pretrial order, and pursuant to agreement of the parties and consent of the court, the cause was tried on the issue of liability by the court sitting without a jury. The parties having filed their proposed findings of fact and conclusions of law, the cause is now ripe for decision on the issue of liability. This opinion constitutes the court's findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

The defendant, SAMI, a wholly-owned subsidiary of Time, Inc., is a corporation

whose principal place of business is in New York City, New York. Although it maintains an office and place of business in Chicago, it is not an Illinois corporation. SAMI gathers, arranges, and provides warehouse withdrawal information to its clients, who are engaged in the food production and processing industries. This information is put in the form of charts and graphs for the client. Among other things, data is compiled to show a client the size of a market in which it has a product, its share of that market, and its competitors' shares. (Tr. 74, 608). During all times relevant herein, C. C. Daniel was and is Senior Vice President of SAMI in charge of, among other things, the Chicago office. (Tr. 15). Daniel does a substantial amount of traveling, spending only approximately one-half of his time in the Chicago office. (Tr. 484). At all times relevant herein, Robert Entwisle was a salesman and second in command in the Chicago office. As second in command, he would discuss with Daniel personnel and management problems in the Chicago office. (Tr. 484).

The plaintiff, Richard Magruder, is a citizen of Illinois. In March of 1970, he was hired by the defendant, through its agent Daniel. Plaintiff and defendant are respectively "employee" and "employer" under the terms of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Daniel hired Magruder to develop a Research Department to aid the sales people, giving him the title of Associate Research Director. (Tr. 12–13, 78). When Daniel hired him, he told Magruder that he, Daniel, did not know much about the research function and that he would expect Magruder to develop and run the Research Department, to be creative about things that would be useful in selling the product, and to work closely with the production (computer) people who provide the raw data. (Tr. 78–80). Daniel was Magruder's immediate supervisor. (Tr. 15). At the time Daniel hired Magruder, he knew that Magruder was about 50 years old. (Tr. 61, 272). Magruder's age was on his application form and on his resume. (Tr. 644).

A complete list of Magruder's functions and duties as Associate Research Director are set out in Plaintiff's Exhibit No. 1. One of the prime functions was the preparation of reports for the sales people. The Associate Research Director was to see that raw computer reports were ordered from the Production Department. (Tr. 197). To the extent that the information in the form ordered by sales people to meet the clients' needs was not directly available through the computer printout emanating from the Production Department, persons in the Research Department would manually "pull" the needed data. (Tr. 77). That is, if the data already programmed was not in the form that the sales personnel needs for a client, then people in the Research Department physically would extract numbers from the computer printout and put them in chart and/or graph form—referred to as "manipulating" data—according to the clients' needs. (Tr. 8–10, 77).

The Research Department initially consisted of plaintiff and one woman. During the period from March, 1970 to the end of December, 1973, however, it grew to twelve people including the plaintiff. (Tr. 228). During the period of time involved in this litigation, the business of defendant's Chicago office grew and prospered. (Tr. 28, 29, 519; Plaintiff's Exhibit [PX] 5).

When plaintiff began working with SAMI, his salary was $20,000 a year. (Tr. 200). In April of 1971, approximately one year after he began working at SAMI, he received a raise of $2,000. Mr. Daniel took part in the decision to grant the raise. Plaintiff also received a $2,000 raise in November of 1972. (Tr. 16–17, 19; PX 2, 16b). Plaintiff received no salary increase after November of 1972. (PX 15a).

Two witnesses, Daniel (Tr. 90) and Mrs. Kathy Cappelli (Tr. 451), testified that plaintiff seldom, if ever, worked late. Plaintiff, however, introduced documentary evidence—company records—indicating that he worked overtime on a number of occasions in 1972 and 1973. (Plaintiff's Group Exhibit 24A through P).

From 1970 through 1973, there was a significant increase in the number of reports handled by the Research Department. (Tr. 281). Kathy Cappelli, an employee in the Research Department, estimated that in the years 1972 through 1974 the workload in that department expanded tenfold. (Tr. 448). Although Cappelli stated that during the latter part of 1973 reports were generally on time (Tr. 452–53), Magruder admitted that lateness and errors in the reports increased during the period 1970 through 1973. (Tr. 281). Entwisle testified that during 1971 and 1972 there was an ongoing problem with reports being late from the Research Department. (Tr. 498). During 1972 and 1973, salesmen such as Entwisle, Traum, and Harlow complained repeatedly to Daniel that reports that they were getting from the Research Department were late and contained errors. The most common complaint was over a report known as the SAMI Marketing Consulting Services [SMCS]. (Tr. 85–86, 165, 167, 495–96, 500–01, 644).

In 1971, Entwisle took Magruder to visit certain clients, including Kraft, Kimberly Clark, and Gulf. (Tr. 490). He found Magruder completely lacking in creativity and that he added nothing to the presentation. (Tr. 491). He therefore stopped taking Magruder. (Tr. 491). In early 1971, Entwisle received some inaccurate figures from Magruder, which were given to a client, causing him serious embarrassment in his presentation to the client. (Tr. 493–94). As Entwisle found that he could not get positive results from Magruder, he went around him to seek the assistance of others in the Research Department. (Tr. 499). Entwisle complained to Daniel with respect to Magruder on these matters in the period 1971 through 1973. (Tr. 85–86, 500–01, 644).

Sometime in 1973, while Magruder was away at a convention, Usman Mirza, a statistician working for Magruder, came to Daniel and complained that reports were late, that material was not being ordered correctly from the Production Department, and that people in the Research Department were not being assigned the workload

correctly. The complaints were about decisions that Mr. Magruder was making. (Tr. 90).

Daniel testified that on a number of occasions in 1973 he had spoken with Magruder about the complaints he had been receiving regarding Magruder. (Tr. 87–88). Entwisle also testified that he had made complaints to Magruder about errors and lateness. (Tr. 494–99). Paul Traum, plaintiff's own witness, testified that he had complained to Magruder about inaccurate and late reports. (Tr. 159, 164–65). Magruder, however, testified that except for a request by Traum that he receive some of his reports within six weeks rather than eight weeks, no salesmen made any complaints to him about his work during 1973. (Tr. 282–84). Magruder also denied that Daniel ever made any complaints about his work to him during 1973 or prior to 1973. (Tr. 238, 284). Having heard the testimony and assessed the credibility of the witnesses, the court finds that Magruder received complaints about his work during 1973.

On November 3, 1973, Magruder told his physician that he was "under extreme stress at work." (Tr. 138; Magruder's doctor quoting from his own office records). At the end of 1973, Magruder suffered a heart attack, and he was away from work until April of 1974. (Tr. 221–22). Although Magruder returned in his capacity as Research Director, in his absence two supervisory assistants in the department, Mr. Mirza and Mrs. Cappelli, assumed his responsibilities in the Research Department. (Tr. 37). During Magruder's absence, Daniel began paying closer attention to activities in the Research Department. (Tr. 647). He observed that there seemed to be more harmony in the group and fewer errors on reports than had previously been the case. (Tr. 647–48). Plaintiff's witness, Paul Traum, testified that while Magruder was absent, the work seemed to be a little bit more smooth and that the workload seemed to be a little bit better. (Tr. 163). Cappelli testified that the reports were out on time during the period of Magruder's absence (Tr. 453), and Magruder admitted that part

of this period was the heaviest of the year. (Tr. 323–24).

When Magruder returned to work on April 1, 1974, he worked on a reduced schedule—approximately two to four hours a day—pursuant to his doctor's recommendations. (Tr. 142). In approximately July of 1974, he resumed full-time work, limited only by his physician's suggestions that when convenient he take a nap after lunch and leave a few minutes early to avoid the rush hour. (PX 32, Tr. 146). Daniel permitted Magruder to set his own hours, and he did so based on Magruder's physician's instructions. (Tr. 44, 57). Daniel allowed Magruder all schedule changes suggested by his doctor for recuperation.

Just prior to Magruder's return, an inexperienced clerical girl quit and another, Arlene Tasker, who was quite experienced and competent, was promoted or taken out of the department. Both were replaced by inexperienced clerical help. (Tr. 237–38, 372–74, PX 4). No evidence linked this development to Magruder.

Two witnesses, Paul Traum and Janet Boerner, testified that the performance of the Research Department was about the same before plaintiff left and after he returned to work. (Tr. 162, 392).

After Magruder's return, and until he was demoted from his position as Associate Research Director, the complaints about him and the quality of the work of the Research Department increased. Some of these complaints were registered during the period of time Magruder was performing his duties on a reduced schedule. Many of the complaints, however, were made after he had resumed full-time work limited only by naps and leaving early to avoid the rush hour.

Shortly after Magruder's return, both Usman Mirza and Kathy Cappelli complained to Daniel that Magruder's presence in the Research Department hindered rather than helped. (Tr. 648). At about this time, Daniel started making written notes of complaints he was getting from others about Magruder. (Tr. 96).

On May 7, 1974, Mirza, one of the plaintiff's main associates (Tr. 525), wrote Daniel a memo stating among other things:

I am complaining to you that the accounts that I am servicing have not yet received proper SCAN service because of poor back-up from Research. (Tr. 97, DX 2).

Mirza was a valuable employee in the Research Department. (Tr. 650). In approximately June of 1974, Mirza, who was about 30 years old at the time (DX 23), told Daniel that he did not think that Magruder was capable of handling his job and that he could not work under Magruder anymore. (Tr. 95, 650). Although Daniel considered Mirza a valuable employee, he backed Magruder. (Tr. 290, 650). A short time later, Mirza resigned and left the company. (Tr. 292–93). Mr. Daniel prepared Mirza's "Employee Removal Form." On it he indicated that Mirza was a good statistician with a good personality and work habits. Daniel also wrote that Mirza left as he did not feel he was progressing fast enough. (PX 38).

Entwisle confirmed that Mirza was talented and that he was a valuable employee. (Tr. 510). At about the time of Mirza's departure, Entwisle told Daniel:

The wrong man is leaving. We shouldn't have Mr. Mirza leave. We should have Mr. Magruder leave. Mr. Mirza should be running the department. (Tr. 511).

Daniel replied that Magruder was running the department and if Mirza was dissatisfied, he could leave. (Tr. 511.)

After Mirza left, Daniel received more complaints about Magruder. (Tr. 99). Daniel spoke to Magruder about these complaints. (Tr. 99). On August 26, 1974, he put Magruder on written warning, listing certain specific problems in the Research Department that he wanted Magruder to correct by December 1, 1974. In the warning, Daniel wrote that "I think the whole department needs revamping and to be under tighter control." (PX 8).

Four days after Daniel put Magruder on written warning, Magruder put one of his supervisory assistants, Kathy Cappelli, (Tr. 447), on written warning. (Tr. 101, DX 4).

A copy of the warning was sent to Daniel. (DX 4). Cappelli testified that Magruder had previously told her that he was going to save his own neck before he saved anyone else's. (Tr. 456).

In response to Magruder's warning memo, on September 4, 1974, Cappelli sent Magruder (and Daniel) a letter expressing her concern about being in serious conflict with Magruder and asking Daniel to resolve the conflict. (Tr. 101, DX 5).

Daniel considered Cappelli's work good, but backed Magruder in the dispute with Cappelli. (Tr. 102). He so stated orally to Cappelli (Tr. 102–03, 463) and in writing. (Tr. 101, DX 6). Magruder testified that it was really Daniel's wish to terminate Cappelli, not his, and that Daniel directed him to warn her and fire her. (Tr. 241, 242–44). He also testified that a memo to Cappelli was dictated by Daniel and that he, Magruder, was ordered to sign it. (Tr. 244). Daniel denied that this was true. (Tr. 652).

Magruder testified that he considered Cappelli a good employee. (Tr. 628). In a letter he wrote to Daniel, dated August 20, 1974, he indicated that even with her drawbacks she did a better than average job. He also wrote, however, that she sometimes exhibited a superior attitude, and that he did not intend to defend her any longer. He wrote that he was willing to replace her with an outsider or Janet [Boerner]. (PX 39). Magruder admitted that Cappelli was unhappy working for him and that she appealed to Daniel to settle a squabble between her and him. (Tr. 295).

When Entwisle learned of Cappelli's impending dismissal, he went to Daniel. He told him that he felt that letting Cappelli go was a "bad mistake," since the workload was so strong and since she was the one that was getting it done. (Tr. 507). Daniel replied to Entwisle that he was going to support Magruder on this matter. (Tr. 508). Daniel also testified that despite the vital function of the Research Department (Tr. 667) and plaintiff's incompetence, he fully supported him even when those he believed to be very capable were leaving or being discharged. He stated that one of the reasons was that he had hired plaintiff and did not want to "look bad" by firing him. (Tr. 101, 102, 650, 652, 658). After Mrs. Cappelli's discharge, Mrs. Janet Boerner assumed Mrs. Cappelli's duties. (Tr. 395).

Although Daniel did not get directly involved with the Research Department, different clerks in the Department came to him in the summer of 1974 saying that they did not know what they were supposed to do. (Tr. 105–06). Accordingly, on October 1, 1974, he wrote a memo to persons in the Research Department outlining their duties. (DX 7). Prior to that time, Daniel had repeatedly told Magruder he should start running his department and making sure that the people were doing their work assignments. (Tr. 105). He had told Magruder to take control, that Kathy and the Department were running him. (Tr. 300).

On October 1, 1974, Daniel gave Magruder a further warning orally. (DX 8). Among other things, Magruder's responsibility for the client service people was terminated, thus cutting his immediate responsibilities approximately in half. (DX 8). At about the time he was put on written warning—in August or September of 1974—Magruder suggested to Daniel that he was thinking of seeking long term medical disability from the company, although he was then working full-time. (Tr. 315, 319). At that time, Magruder had no medical restrictions on the kind of work he could do other than the suggested half-hour nap when convenient and leaving early to avoid the rush hour. (Tr. 316). The basis of his claim for long term disability was his heart condition. (Tr. 361).

Sometime in the fall of 1974, Magruder's roommate, Otis, called Daniel. In their conversation Otis stated that he hoped Daniel could get the problems the company was having with Magruder straightened out, since he was involved with Magruder in joint ownership of property. He did not want to have to sell or mortgage one of the properties to raise legal fees to help Magruder get disability retirement. (Tr. 657).

Plaintiff's witness, Janet Boerner, admitted that during the period of late 1974 and into 1975 it was becoming more difficult to get reports out of the Research Department on time. (Tr. 402). She stated that during this period there was a big problem of the salesmen setting up meeting dates with clients and having to cancel them because of not receiving Research Department reports on time. (Tr. 403). Mrs. Boerner also related a number of instances in which, after Magruder returned to work, Daniel berated Magruder about his performance and late reports in the presence of the . Research Department personnel.

In the summer and fall of 1974, Mary Sue Honigschmidt, a former computer programmer who had become a client service person in early 1974, made several complaints to Daniel based upon her observations of Magruder's running of the Research Department. She told Daniel that she believed the company should get rid of him because he was incompetent and had not organized the Department. (Tr. 550–51). She had observed inefficient use of data in the Research Department—too many reports had to be looked through to get the needed data. (Tr. 540). She had worked on a system to cut down on the amount of source data. (Tr. 542). She had observed Magruder repeatedly giving inaccurate information to client service persons in sessions he conducted. (Tr. 547–48). She also had observed that there was no good system for keeping track of the progress of projects in the Research Department. (Tr. 549).

In March of 1975, Honigschmidt informed Daniel that she wanted a transfer back to production because there was no organization in the Research Department, things were getting worse, the workload was increasing, and nothing was being done to make the situation any better. (Tr. 554–55, 560). Sales people and other client service people, and some others in the Research Department, were also complaining to Daniel that things were not organized and that client service people had to do clerical work. (Tr. 117).

In approximately April of 1975, Magruder and Daniel spoke of the possibility of Magruder becoming a client service person. (Tr. 316–17). This would have been a demotion for Magruder. Magruder understood that Daniel was unhappy with the way he was performing his job as Associate Research Director. (Tr. 318). He admitted that Daniel's dissatisfaction with his work was obvious to him. (Tr. 319).

Around May, 1975, Daniel decided he would have to replace Magruder as Associate Research Director. (Tr. 123). He had lost several good people, and one person had threatened to leave or be transferred. (Tr. 123). He wrote a memo to his superior, saying that he proposed to replace Magruder as Associate Research Director and offer him a job as a clerk. (DX 12).

On or about July 10, 1975, Daniel informed Magruder that he was replacing him as Associate Research Director. (Tr. 123, 327–31). He offered Magruder a lesser position within the Department at a salary of $18,000. This was a substantially higher salary than anyone else in the Department at that time. Magruder testified that Daniel told him that he had checked with the company's attorneys on this matter. (Tr. 368). Magruder admitted that Daniel told him he was demoting him because he was dissatisfied with the way Magruder was handling the pressure of the job as Associate Research Director. (Tr. 328). These included the time deadlines (Tr. 334), which were also very much on the client service people. (Tr. 335). Magruder also admitted that Daniel told him that he delegated too many things to subordinates (Tr. 334), and that Daniel told him that he wanted someone to run the Department and not let it run him. (Tr. 334). Magruder conceded that this had been a repeated criticism by Daniel of him. (Tr. 334, 704).

Shortly after learning of his demotion, Magruder saw a lawyer and then wrote Daniel a memo accepting his demotion stating that (Tr. 336–37):

I do not agree that my physical handicap and the resulting minor restrictions interfere with my being able to competently

and fully handle my present job. (PX 31).

Magruder, however, admitted that Daniel never said that Magruder's physical condition kept him from functioning properly as Associate Research Director. (Tr. 336–37, 632).

Although he first denied it (Tr. 632), Magruder later admitted that he wrote a letter (DX 22) to the company stating: "According to Mr. Daniel, my medical condition completely prevents me from performing the duties of Associate Research Director." (Tr. 633). Magruder wrote this statement, even though Daniel said no such thing, in an attempt to get disability retirement. (Tr. 633). Magruder had originally applied for disability retirement on September 9, 1974. (Tr. 637). He admitted that to get such retirement he would have to try and show that he was physically and medically unable to continue performing his job duties. (Tr. 637). He also admitted that he was trying to convince the company that he was physically and medically disabled from performing all the duties of his job (Tr. 638), although his own doctor stated in writing that "he is fully able and capable of handling the duties of his job equally as well as he did prior to his heart attack." (PX 34).

E. Patrick Link, a former client service representative, was chosen to replace Magruder. Link is younger than Magruder. (DX 23). A significant factor in Daniel's choice of Link was that Link had a computer background. Daniel wanted someone who knew the computer system because the Research Department works closely with the computer people. (Tr. 125–26).

On September 2, 1975, subsequent to his demotion, Magruder's counsel wrote to the Personnel Director of Time, Inc., indicating that in his opinion the defendant's actions in demoting the plaintiff were in violation of the Federal Age Discrimination Law and the laws of the State of Illinois relating to discriminatory practices by employers because of employees' physical disabilities. (PX 28). The letter also stated an intention to institute legal action if the alleged acts

of the employer were not rectified. On September 19, 1975, one week before the plaintiff's discharge, his counsel wrote to the Director of Labor Relations of Time, Inc. (PX 29). He set forth essentially the same allegations in a more complete form again indicating his opinion that the acts of the defendant were in violation of federal and state statutes and also constituted a common law tort. There was no evidence, however, that plaintiff's subsequent discharge was in retaliation for his opposition to the alleged discrimination because of his age.

Although Defendant's Exhibit No. 12 indicates that Daniel proposed to offer Magruder a job as a clerk, there was some evidence that Daniel had offered him Janet Boerner's job as Coordinator of Projects. (Tr. 327–34, 669–71). Magruder, however, did not replace Mrs. Boerner and was not relocated in the office she occupied. (Tr. 252, 374–75). Magruder was placed out in the general office area with the clerks, working alongside of them, doing the same work they were doing—pulling data. (Tr. 252, 621). Magruder testified that he found this position embarrassing and distressing. Janet Boerner testified that Magruder's demotion was embarrassing to her and that he appeared to be distressed and upset. There was also some evidence that Magruder felt under pressure at work and that he suffered from anxiety and stress. (Tr. 144–45, PX 33 and 34). There was, however, no evidence that Daniel or any other agent of the defendant pursued a course of conduct calculated to cause the plaintiff mental anguish and physical suffering.

On September 22, 1975, Daniel was informed by a salesman, John Harlow, that the Ralston-Purina chart was full of errors, that it had delayed his presentation, and that he was in trouble with the client. (Tr. 127). Link also reported this to Daniel. Daniel asked Link who had pulled the Ralston-Purina figures and was told that it was Magruder. (Tr. 128). Daniel received memos from Harlow and Link on this which stated that the errors were due to sheer carelessness and that they were inexcusable

for someone experienced in the Department. (DX 15 and 16). Daniel also received the charts with all the errors on them. (Tr. 129, Defendant's Group Exhibit 17).

As standard procedure, client service representatives check the charts manually pulled by the Research Department personnel for obvious errors and accuracy. (Tr. 576–77, 580). Charts are in "decks" containing 50 to over 100 charts each. (Tr. 577). The most errors that client representatives Palesh and Link had ever found in decks they checked, other than this deck pulled by Magruder, were about 12 to 16. This was so even in the largest decks. (Tr. 579, 583). In checking about 90 of the charts done by Magruder for the Ralston-Purina Company in September, 1975, Palesh found 45 to 50 errors in 24 different charts. (Tr. 581, 592). These errors were checked against the source data (Tr. 580–81) and against the copy sent to the chartist (Tr. 597–98). It was determined that the errors could have been made only by Magruder. The charts that Magruder had done for the Riviana Company were filled with the same kind of errors. (Tr. 602). The Ralston-Purina deck which Magruder did was a long deck, however, it was not as complicated as the Kraft, S. C. Johnson, and Green Giant decks. (Tr. 604–05, 625).

Based upon the nature and extent of his errors in the Ralston-Purina deck, Daniel decided to discharge Magruder. (Tr. 131.) Daniel had a meeting with Magruder and Link. When he asked Magruder if he could explain the errors, Magruder, although he had done a substantial amount of data pulling when he was first hired (Tr. 280), simply stated that he was not hired to pull numbers. (Tr. 132).

Magruder was discharged on or about September 26, 1975. (DX 23). At the time of plaintiff's discharge, his employer had previously instituted a system of retirement benefits, including pension, which permitted retirement at age 60 with partial benefits to be paid until age 65, at which time full benefits would be paid to the retiring employee. (Tr. 264–67). The employees were notified of the retirement plan and other company benefits by various memoranda and notices. These were disseminated to the employees, including the plaintiff, by Daniel's secretary at various times during the term of plaintiff's employment. (Tr. 267).

There is no evidence of any conversation between Daniel and Magruder relating to Magruder's age within a year before Magruder's demotion, and no evidence of any such conversation between his demotion and his discharge three months later. Magruder testified that in mid 1974 Daniel made a comment to the effect that he did not realize that Magruder was 55. Magruder, however, admitted that Daniel knew how old he was when he had hired him four years earlier (Tr. 275), and that Daniel said nothing about Magruder's age having anything to do with his work. (Tr. 358). Magruder also testified that in the same general period of time, Daniel once said to him at lunch something to the effect that he was too set in his ways, because of his age, to change. Nevertheless, Magruder admitted that he did not remember Daniel's exact words, that this was in a general conversation about older persons being more set in their ways, and that Daniel did not relate this comment to Magruder's work. (Tr. 262). Magruder further testified that in the late summer of 1974, Daniel asked Magruder where he could find another job at his age. He further testified, however, that Daniel's comment was in relation to his possibly getting disability retirement for a couple of years and then being found to be no longer disabled and having to seek work. (Tr. 236–37).

Of the 15 management and sales persons hired by, and reporting to, Daniel during the period of January 1, 1971, to April 1, 1977, whose ages are known, 10 out of 15 were over 40 years of age. Five out of the 15 were over 50 years of age. Robert Entwisle is 55 years old. Another salesman, Nelson Thomas, is 60 years old. (DX 23).

Entwisle had a heart attack in September of 1974. He was off three months. He had open heart surgery in February of 1975.

He was off three more months. His job responsibilities were not changed before, during, or after his heart problems. (Tr. 511–12). Daniel accommodated his needs for schedule changes for recuperation. (Tr. 513).

Daniel hired Jules Perozzi, even though the company doctor recommended against it because Perozzi had had cancer a year and one-half previously. (Tr. 659–60).

### Decision

This court has jurisdiction over the subject matter of this action pursuant to 29 U.S.C. § 626, 28 U.S.C. § 1332, and the doctrine of pendent jurisdiction.

### Count I

With respect to Count I, defendant is an employer engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 630(b). At all times relevant herein, plaintiff was an employee within the meaning of 29 U.S.C. § 630(f). Plaintiff has satisfied the conciliation requirement of 29 U.S.C. § 626(b).

█ Under the Age Discrimination in Employment Act, the plaintiff has the burden of proving by a preponderance of the evidence that his age in fact made a difference in his employer's determination to demote or discharge him. *Laugesen v. Anaconda Co.*, 510 F.2d 307, 310, 311 (6th Cir. 1975). That is, in order to support a finding of unlawful age discrimination, plaintiff must demonstrate that his age was a determining factor in his employer's decision to demote or discharge him. *Mastie v. Great Lakes Steel Corp.*, 424 F.Supp. 1299 (E.D. Mich.1976). The Act permits differentiation between employees based upon reasonable factors other than age. 29 U.S.C. § 623(f)(1). It also provides that it is not unlawful for an employer to discharge an individual for good cause. 29 U.S.C. § 623(f)(3). In short, the Act is designed only to attack those employers' personnel policies and practices which arbitrarily classify employees or potential employees on the basis of age. It does not seek to affect employer decisions based on individual assessments of a person's abilities, capabilities, or potential. *Mastie v. Great Lakes Steel Corp., supra* at 1307. The parties do not dispute that this is the law.

█ Under the facts of this case, the court concludes that plaintiff has failed to demonstrate by a preponderance of the evidence that his age was a determining factor in either his demotion or his discharge. On the contrary, the court concludes that plaintiff's demotion was a result of his unacceptable job performance and his inability to improve after repeated warnings. His discharge was triggered by his performance and behavior and by the serious and careless errors he committed after his demotion. There is neither a basis in the record for concluding that there is a causal link between plaintiff's age and his demotion and discharge, nor is there a basis for concluding that plaintiff's discharge was in retaliation for his opposition to alleged age discrimination. Finally, there is no evidence of a practice or pattern, on the part of the defendant, to discharge older workers. If anything, the evidence shows that the defendant had a preference or pattern favoring older workers.

The actions taken by the defendant with respect to the plaintiff, therefore, were based upon reasonable factors other than age, were for good cause, and were not unlawful under the Age Discrimination in Employment Act. Accordingly, with respect to the allegations of age discrimination raised in Count I of plaintiff's complaint, judgment will be entered for the defendants.

### Count II

█ From the papers filed by the parties, it is evident that they have presumed that Illinois law applies with respect to Counts II and III. In a diversity action such as this, however, the initial consideration is necessarily what substantive law governs the determination of the issues presented by those counts. As this court sits within the state of Illinois, it must apply the substantive law of Illinois in this

diversity action, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including its choice of law rules, *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).* It is well settled that under Illinois choice of law rules Illinois courts apply the Second Restatement Approach in tort cases. That is, they apply the law of the state with the most significant relationship to the transaction. *Ingersoll v. Klein*, 106 Ill.App.2d 330, 245 N.E.2d 288 (1969), *aff'd*, 46 Ill.2d 42, 262 N.E.2d 593 (1970).

■ Count II has been brought under the Equal Opportunities for the Handicapped Act, Ill.Rev.Stat. ch. 38, § 65–21 *et seq.* Although it is a criminal statute, the Act specifically authorizes an action for damages. Ill.Rev.Stat. ch. 38, § 65–29. It authorizes a cause of action for practices which may be characterized as tortious conduct. The court concludes that the state having the most significant relationship to the transaction is Illinois and that it must apply Illinois law.

■ The Equal Opportunities for the Handicapped Act is a fairly new statute. The relevant section here is § 65–23, which provides that it is unlawful for an employer to discharge an employee because of a physical or mental handicap not related to job performance. *Loucks v. Star City Glass Co.*, 551 F.2d 745, 748 (7th Cir. 1977). Like most acts designed to protect against discrimination, the burden is on the plaintiff to prove by a preponderance of the evidence that his physical or mental handicap in fact made a difference in his employer's determination to refuse to hire, discharge, or otherwise discriminate against him.

■ In the case at bar, the court concludes that the defendant is a person and employer under § 65–22. The court further concludes that the plaintiff has failed to carry the burden of proof that he was discriminated against on the basis of a physical or mental handicap in violation of the Equal Opportunities for the Handicapped Act. Plaintiff has failed to establish that he was, at material times, under a physical or mental handicap. To the contrary, the evidence is clear that he had no physical disability remaining from his heart attack which interfered with his job performance at or near the time of his demotion and discharge, that he was given all medically prescribed accommodations during his recuperation, and that his demotion and termination were unrelated to his physical condition.

The record shows that plaintiff, not his employer, attempted to claim that his physical condition caused his poor work performance. This was done in the hope of securing a long term disability retirement pension. Moreover, it is noteworthy that Robert Entwisle, second in command and 55 years old, missed more time because of recuperation from heart problems than did plaintiff without in any way being penalized. It was also uncontradicted that plaintiff's superior, Daniel, went out of his way, contrary to the recommendations of the company doctor, to hire an employee who had previously had a bout with cancer. There is simply no evidence that defendant had any pattern or practice of discrimination against plaintiff or other persons because of a physical or mental handicap.

The actions taken by the defendant with respect to the plaintiff, therefore, were based upon reasonable factors other than a physical or mental handicap, were for good cause, and were not unlawful under the Equal Opportunities for the Handicapped Act. Accordingly, with respect to the allegations of discrimination based upon a physical handicap raised in Count II of plaintiff's complaint, judgment will be entered for the defendant.

### Count III

Count III sets forth allegations of intentional infliction of emotional distress.

---

* *See also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and 13 Wright and Miller, Federal Practice and Procedure, § 3567 at 462 (where a federal court exercises pendent jurisdiction over a state-created claim, state substantive law is controlling on the pendent claim).

Again, this court will apply the law that an Illinois court would apply—Illinois law.

■ The tort of intentional infliction of emotional distress is recognized by Illinois courts. *Knierim v. Izzo*, 22 Ill.2d 73, 174 N.E.2d 157 (1961). The elements of the tort were articulated in that case:

> the determination of whether words or conduct are actionable in character is to be made on an objective rather than subjective standard, from common acceptation. The unwarranted intrusion must be calculated to cause "severe emotional distress" to a person of ordinary sensibilities, in the absence of special knowledge or notice. There is no inclination to include all instances of mere vulgarities, obviously intended as meaningless abusive expressions. *Id.* at 86, 174 N.E.2d at 164.

Plaintiff, of course, bears the burden of proof.

■ There is no evidence in the record to support the conclusion that Daniel or any other agent of the defendant pursued a course of conduct calculated to cause the plaintiff mental anguish and physical suffering. Moreover, there is no evidence to support the conclusion that such a course of conduct was embarked upon in an effort to force plaintiff to accept a demotion and to place defendant in a position whereby it could discharge him and falsely claim that his discharge was for cause. Plaintiff has failed to carry his burden.

The evidence merely reveals a situation wherein an employer has had to replace the head of his Research Department for good cause. Daniel ran an organization which was growing rapidly. Magruder headed a department for him which was to supply important services to clients. There were many business and time pressures. When Magruder failed to produce, Daniel spoke with him, warned him, and on occasion berated him. This is the kind of behavior that one would expect from a superior who is dissatisfied with his subordinate's performance. What Daniel said and did was well within the normal scope of an employment relationship. There is no evidence that Daniel said or did anything calculated to cause Magruder mental anguish or physical suffering.

It might be argued that it would have been wiser for Daniel to have demoted or discharged Magruder earlier than he did. That he did not, however, does not require the inference that Daniel pursued a calculated course to cause the plaintiff mental anguish or physical distress. Other equally, and in fact more compelling, inferences are that Daniel wanted to give Magruder a fair chance, that Daniel hoped Magruder's performance would improve, or that Daniel did not want to be in the position of firing someone he had hired.

Finally, plaintiff's argument that it was inhumane of Daniel to demote him rather than to have discharged him is specious. Plaintiff may have been embarrassed or distressed because he was demoted, but this is a normal response to a demotion. There was no evidence that Daniel embarked on a course of conduct intended to cause Magruder severe emotional or physical distress.

Accordingly, with respect to the allegations of intentional infliction of emotional distress raised in Count III of plaintiff's complaint, judgment will be entered for the defendant.

For the reasons stated, it is therefore ordered that judgment shall be, and the same is hereby, entered in favor of the defendant on all counts.

It is further ordered that counsel for the defendant prepare and submit an appropriate form of judgment.